IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOIS A. SOLI, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 08-3483 |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of the Social Security | : | |
| Administration, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

YOHN, J.                                                                              July __, 2010

      Plaintiff, Lois A. Soli, appeals the decision of the Commissioner of Social Security (the

"Commissioner") denying her application for disability insurance benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 401-434 (the "Act").  After briefing on plaintiff's

request for review was completed, I referred the matter to United States Magistrate Judge Henry

S. Perkin, who issued a report and recommendation ("R & R") recommending that the case be

remanded to the Commissioner for further review.  Magistrate Judge Perkin concluded that the

decision of the Administrative Law Judge ("ALJ") was not supported by substantial evidence

because the ALJ (1) improperly relied on testimony from a medical expert who had not reviewed

all of the relevant medical records, (2) failed to consider a prior ALJ's finding that plaintiff

suffered from a severe mental impairment during the time period immediately preceding the time

period at issue in this appeal, and (3) failed to address the credibility and impact of testimony

from plaintiff's mother and husband.  The Commissioner has now filed objections to the R & R,

and plaintiff has filed a response. Upon consideration of the R & R, the Commissioner's objections thereto, plaintiff's response to the objections, and the entire administrative record, and for the reasons set forth herein, the court will adopt the recommendation of Magistrate Judge Perkin and remand the case to the ALJ for further consideration consistent with this memorandum.

## I. Facts and Procedural History

Plaintiff is a forty-eight year old woman with a high school education and prior work experience as a food service worker, a customer service representative, a secretary, and a meat packer. (R. 65, 74, 79.) Plaintiff stopped working in October 1994 when she injured her hands in her job as a meat packer[1] (R. 73, 762), and she was thereafter diagnosed with carpal tunnel syndrome (*see, e.g.*, R. 933).[2] When two to three years of conservative treatment failed to relieve her pain, plaintiff underwent carpal tunnel release surgery on her right hand in August 1997 (R. 1012-13); however, she continued to experience increasing pain in both hands and wrists and numbness in her fingertips (*see, e.g.*, R. 295, 615-16, 1056-58). Since she stopped working in 1994, plaintiff also has been treated for anxiety and depression relating to her physical problems and inability to work. In February 1999, plaintiff gave birth to a son, after which time she began to experience neck and back pain as well. (R. 291-92, 301; *see also* R. 100.) Plaintiff currently resides with her husband, son, and mother in her mother's home, to which she relocated because

---

[1] Although plaintiff had been hired by the meat packing company as a secretary, after two months on the job, she was required to switch to a meat packer position in order to continue her employment with the company. (R. 743, 1053.)

[2] Plaintiff previously had been diagnosed with bilateral de Quervain's disease, a painful inflammation of certain tendons that extend the thumb, for which she underwent surgery in 1985 or 1986. (R. 788, 934, 937.)

she needed help with household activities.  (R. 94.)

Plaintiff first applied for DIB in July 1997, alleging disability due to carpal tunnel syndrome, stress, and depression with an onset date of October 11, 1994.  (R. 700-02; *see also* R. 745.)  That claim was initially denied in March 1998 (R. 683-87), and a hearing was thereafter held before ALJ Javier A. Arrastia in December 1998 (R. 1045-76).  ALJ Arrastia issued a written decision denying plaintiff's claim on January 23, 1999.  (R. 668-78.)  Applying the Social Security Administration's five-step sequential evaluation process for determining whether an individual is disabled, *see* 20 C.F.R. §§ 404.1520,[3] ALJ Arrastia found, based on the medical evidence, that plaintiff suffered from two severe impairments:  "bilateral carpal tunnel syndrome with status post carpal tunnel release" and "adjustment disorder with depression."  (R. 671, 676.)  However, he concluded that these impairments, individually or in combination, did not meet or medically equal a listed impairment; that plaintiff retained the ability to perform a range of light work (albeit less than the full range of such work) despite her impairments; and that there were a significant number of jobs in the national economy that plaintiff could still perform.  (R. 676-77.)  Plaintiff requested review of ALJ Arrastia's decision (R. 662-64), which request the Appeals

---

[3] The Third Circuit has summarized this five-step process as follows:

> In the first four steps the burden is on the claimant to show that she (1) is not currently engaged in gainful employment because she (2) is suffering from a severe impairment [or combination of impairments] (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her lacking the [residual functional capacity] to return to her previous employment.  If the claimant satisfies step 3, she is considered per se disabled.  If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform.

*Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005) (internal citations omitted).

Council denied in March 2002 (R. 653-54).

On September 11, 2000, while her request for review of ALJ Arrastia's adverse decision was still pending, plaintiff submitted a second DIB application, alleging disability due to carpal tunnel syndrome, cervical stenosis, arthritis, depression, and anxiety with a disability onset date of January 24, 1999, the day after the date of ALJ Arrastia's decision. (R. 65-67, 73.) The application was denied in December 2000 (R. 51-54), and plaintiff thereafter requested a hearing (R. 55). A hearing was held before ALJ Owen B. Katzman on May 6, 2002, at which plaintiff, her husband, and a vocational expert testified. (R. 286-313.) On August 29, 2002, ALJ Katzman issued a written decision denying plaintiff's claim. (R. 23-32.) The ALJ concluded that although the medical evidence reflected that plaintiff suffered from depression and bilateral carpal tunnel syndrome up to and including December 31, 1999 (the last date on which plaintiff was insured for DIB), these impairments were not "severe" within the meaning of the regulations. (*See* R. 28, 31.) Plaintiff requested review of the ALJ's decision (R. 19), but the Appeals Council denied the request in March 2004 (R. 9-12).

In August 2004, plaintiff sought judicial review of the ALJ's adverse decision in this court, filing a complaint and a motion for summary judgment, which plaintiff styled as a "brief and statement in support of plaintiff's request for judicial review." *Soli v. Barnhart*, No. 04-3904 (E.D. Pa. filed Aug. 17, 2004) (Docket Nos. 1 & 9). (*See also* R. 357.) In response to plaintiff's motion, the Commissioner filed a motion to remand.[4] (R. 353-54.) The court granted the

_____

[4] The Commissioner requested that the case be remanded "for the ALJ to evaluate and explain the weight given to all relevant medical evidence including medical source opinions and, if necessary, obtain testimony from a medical expert as to the limitations, if any, imposed by Plaintiff's impairments prior to her date last insured." (R. 353-54.) The motion also noted that "[o]n remand, the ALJ will obtain, if available, Plaintiff's prior claim file relating to her DIB

4

motion, with plaintiff's consent, on March 10, 2005.  (R. 352.)

The following month, the Appeals Council issued an order vacating the ALJ's August 2002 decision and remanding the case to the ALJ with instructions to (1) consider the evidence submitted in connection with plaintiff's July 1997 DIB application and ALJ Arrastia's decision thereon; (2) consider an October 2000 examining source opinion from Stuart Wolfe, M.D.; (3) evaluate and explain the weight given to all relevant medical evidence, including medical source opinions (including requesting additional evidence or clarification from the medical source, as necessary); (4) re-evaluate plaintiff's maximum residual functional capacity; and (5) obtain evidence from a medical expert to clarify the nature and severity of plaintiff's impairment, if necessary.[5]  (R. 360-61.)

The ALJ thereafter held a hearing in the case on November 17, 2006,[6] at which plaintiff, her mother, her husband, and a vocational expert testified in person, and a medical expert testified by telephone.  (*See* R. 597-648.)  On December 11, 2006, the ALJ issued the adverse decision that is the subject of plaintiff's current appeal.  (R. 329-39.)  Although the ALJ reversed his earlier determination as to plaintiff's carpal tunnel syndrome, finding it to be a severe impairment, he went on to conclude that plaintiff was not disabled because she retained the

_____

claim filed on July 17, 1997."  (R. 354.)

[5] The Appeals Council also directed the ALJ to consider on remand whether to consolidate a further claim plaintiff had filed in October 2003 for benefits under Title XVI of the Act with her September 11, 2000, Title II claim.  (R. 361.)  The ALJ concluded that there was no basis on which to reopen plaintiff's Title XVI claim or to consolidate it with her Title II claim.  (R. 330.)  Plaintiff does not challenge this conclusion in her current appeal.

[6] Although the ALJ initially scheduled the hearing for September 5, 2006 (R. 363-67), the hearing was continued because the medical expert had not received plaintiff's records (R. 595-96).

residual functional capacity to perform a significant range of light work, and there remained a significant number of jobs she could perform in the national economy. (R. 337-38.) The ALJ again concluded that plaintiff's alleged mental impairments were not severe, and found "no corroboration" of any significant lumbosacral or cervical spine impairment on or before December 31, 1999. (R. 332-33.) After receiving several extensions, plaintiff filed exceptions to the ALJ's decision in December 2007 (R. 317-20), but the Appeals Council denied review in May 2008, finding "no reason under our rules to assume jurisdiction" (R. 314-16).

On July 24, 2008, plaintiff filed the instant civil action, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). Following briefing by the parties on plaintiff's request for review, I referred the matter to a magistrate judge, who issued an R & R on March 15, 2010, recommending that the case be remanded. In particular, the magistrate judge found that the ALJ's ultimate conclusion that plaintiff was not disabled from January 24, 1999, to December 31, 1999, was not supported by substantial evidence because the ALJ (1) improperly relied on the testimony of the medical expert, whose review of plaintiff's file was limited to records post-dating the January–December 1999 period of claimed disability; (2) failed to consider ALJ Arrastia's finding that plaintiff suffered from a severe mental impairment up to and including January 23, 1999, in concluding that plaintiff's mental impairment was not severe for the period of time beginning just one day later; and (3) failed to properly assess the credibility and impact of testimony from plaintiff's mother and husband.[7] (R & R 9-20.) The

_____

[7] In light of his conclusion that remand was necessary for these reasons, the magistrate judge found it unnecessary to address plaintiff's further contentions that the ALJ misapplied the severity standard in concluding that plaintiff's cervical spine and mental impairments were not severe and improperly disregarded plaintiff's treating physician's opinions regarding plaintiff's physical limitations. (R & R 8, 20.)

Commissioner objects to all of these findings.

## II.  Legal Standard

The court reviews *de novo* those portions of the magistrate judge's R & R to which objection is made, and may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  In contrast, the court's review of the ALJ's decision is deferential.  On such review, the court must determine whether the ALJ's findings are supported by substantial evidence.  *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003); 42 U.S.C. § 405(g).  "'Substantial evidence' has been defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Reefer*, 326 F.3d at 379 (citations omitted).  In reviewing the record for substantial evidence, the court "may not 'weigh the evidence or substitute [its own] conclusions for those of the fact-finder.'"  *Rutherford*, 399 F.3d at 552 (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

## III.  Discussion

### A.  ALJ's Reliance on Medical Expert's Testimony

The Commissioner first objects to the magistrate judge's conclusion that remand is necessary because the ALJ improperly relied on the testimony of the medical expert, whose opinions were based on his review of an incomplete record.

As the ALJ noted, the issues before him for decision were whether plaintiff "was under a disability between January 24, 1999 and December 31, 1999, the date-last-insured, and whether any disability has continued."  (R. 330.)  Because plaintiff's medical records for 1999 were sparse, the ALJ observed that he would "rely on the evidence both immediately before and after

1999 to determine if it is logically probative of [plaintiff's] mental and physical health in that year." (R. 331.) Indeed, one of the reasons the case was remanded to the ALJ for further consideration following his initial, August 2002 decision in the case was so that the ALJ could obtain the file relating to plaintiff's earlier, July 1997 DIB claim. (R. 354; *see also* R. 361 (Appeals Council's remand order directing the ALJ to "[c]onsider the evidence in connection with the prior application filed in July 1997 and the prior [ALJ's] decision issued on January 23, 1999").)

Another reason for the remand was so that the ALJ could, "if necessary, obtain testimony from a medical expert as to the limitations, if any, imposed by Plaintiff's impairments prior to her date last insured." (R. 353-54; *see also* R. 361.) On remand, the ALJ elected to avail himself of this option and requested that Dr. Malcolm A. Brahms, a Board-certified orthopedic surgeon, appear at the hearing and give testimony as a medical expert "primarily for clarification or interpretation of the medical evidence of record." (R. 346-48.) The record reflects that, consistent with the Appeals Council's directive that the evidence in connection with plaintiff's July 1997 DIB claim be considered, the ALJ intended to provide Dr. Brahms with the entirety of plaintiff's medical records, including the records from that earlier claim. (*See* R. 591-92.)[8] However, the medical expert's review was apparently limited to records from May 2000 and later, as he testified at the November 17, 2006, hearing that "[m]ost of my review begins with

_____

[8] In particular, the ALJ noted on the record at the September 5, 2006, hearing that he had instructed his clerk to send "both files"—*i.e.*, the file pertaining to plaintiff's July 1997 DIB claim as well as the file pertaining to her September 2000 claim—to Dr. Brahms. (*See* R. 591-92.) As noted, the September 5 hearing was ultimately adjourned because Dr. Brahms apparently had not received plaintiff's files. (R. 595-96.)

May of 2000 . . . . I don't have information reparable to '99, prior to '99."[9]  (R. 602.)

Based on his review of records from May 2000 forward, Dr. Brahms testified that as of the first six months of 2000, plaintiff had mild carpal tunnel syndrome in her left hand, degenerative disc disease in the cervical and lumbar spine, and chondromalacia of both knees.[10] (R. 605-06.)  When asked about plaintiff's residual functional capacity "as of the first six months of the year 2000,"[11] Dr. Brahms testified that plaintiff (1) could sit and stand for six hours in an eight-hour day with a sit/stand option, (2) could walk for six hours in an eight-hour day, (3) could lift 25 pounds occasionally and 10 pounds frequently, (4) would not have trouble bending but should avoid repetitive lifting from below waist level (though she could do such lifting occasionally), (5) could push something that weighed up to 20 pounds, (6) could climb a flight of stairs occasionally but should avoid ladders, scaffolds, and ropes, and (7) would have no environmental limitations.  (R. 606-08.)  In response to questioning by plaintiff's counsel, Dr. Brahms agreed that while the records he had reviewed contained references to plaintiff's 1997 carpal tunnel release surgery, he had not reviewed any of the medical records or reports from the

_____

[9] Dr. Brahms, who testified by telephone at the November 2006 hearing, did not have plaintiff's medical records with him during his testimony but instead referred to his notes from his review of plaintiff's file.  (R. 601, 603, 608.)

[10] Dr. Brahms also noted that there was evidence of depression (R. 605), but when questioned by plaintiff's counsel, he agreed that given that his specialty was orthopedics, that was not an area on which he would comment (R. 610).  As a result, he did not address the severity of this impairment and did not take it into account in commenting on plaintiff's residual functional capacity.  (*See* R. 606-08.)

[11] The ALJ assumed, for purposes of the hearing, that "whatever condition [plaintiff] had in May [2000] existed at least of that severity as of December 31st the year before" (R. 605); however, he did not ask Dr. Brahms about the onset date of plaintiff's neck, back, and knee problems.

doctor who performed the surgery.  (R. 609-11, 619-20.)

In his December 11, 2006, decision, the ALJ noted Dr. Brahms's testimony that he had found evidence in plaintiff's medical records from May 2000 forward "for knee chondromalacia, cervical degenerative disc disease without stenosis or radiculopathy, and similar findings for lumbar spine"; that "[t]here was no evidence for right carpal tunnel syndrome in the May 2000 electromyogram"; and that plaintiff "had not met a listing as of 2000."  (R. 335.)  Although Dr. Brahms did not regard plaintiff's carpal tunnel syndrome as significant (*see* R. 610, 618-19, 621), the ALJ concluded that there was "sufficient objective data to find that the carpal tunnel syndrome or, at least, the sequelae from [plaintiff's] 1997 surgery had more than a de minim[i]s effect on functioning and thus was severe" (R. 335).  Nevertheless, the ALJ accepted the majority of Dr. Brahms's opinions regarding the extent of plaintiff's physical limitations, finding them to be "supported by the medical record as a whole."  (*Id.*)  In particular, the ALJ accepted Dr. Brahms's opinions that plaintiff "could lift and carry 20 pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours per workday . . . ; push and pull normally; . . . and not use ladders, ropes, or scaffolds."  (*Id.*)  The ALJ did not accept Dr. Brahms's opinion that plaintiff required a sit/stand option to be able to sit or stand for six hours per workday and should avoid repetitive lifting from below the waist, finding these limitations to be based on a severe lumbar spine and/or knee impairment, which the ALJ concluded had not been established by December 31, 1999, the date last insured.  (*Id.*)  The ALJ also added the limitation that plaintiff "not perform repetitive hand motions such as typing or use hand tools" due to her carpal tunnel syndrome.  (*Id.*)

Dr. Brahms's primary purpose at the hearing was to clarify and interpret the medical

evidence of record (*see* R. 347), a function he could only perform effectively with access to all of the relevant medical records, which, in this case, included the records relating to plaintiff's 1997 DIB application (*see* R. 361). Because Dr. Brahms formulated his opinions regarding the extent of plaintiff's limitations (or lack thereof) as a result of her carpal tunnel syndrome and related surgery without the benefit of plaintiff's medical records from 1999 and earlier—including the records and reports of Dr. Saied Talaie, who performed plaintiff's August 1997 carpal tunnel release surgery and continued to treat her for post-operative issues for much of the following year, and whose observations and opinions differ significantly from those of Dr. Brahms[12]—his opinions were necessarily based on incomplete information. Although the Commissioner suggests otherwise (*see* Def.'s Objections 2), the ALJ relied on Dr. Brahms's incomplete opinions in formulating plaintiff's residual functional capacity, adopting his opinions regarding

_____

[12] For example, while Dr. Brahms testified that he did not believe that a person with plaintiff's diagnosis would be expected to have the level of pain that plaintiff described as "carpal tunnel surgery is very successful in relieving symptoms" and "[o]nly rarely" fails to complete the objective (R. 618-19), Dr. Talaie's records reflect his concern that surgery might not completely alleviate plaintiff's symptoms (*see* R. 905 (noting that plaintiff's failure to regain the sensory function of her fingertips could be due to "irreversible damage to the median nerve due to the delay for the treatment of carpal tunnel"), R. 917 (noting that during plaintiff's surgery "severe scarring of the median nerve was found" and that "[p]ost-operative recovery appeared to be complicated by the severe scarring and degenerative changes of the nerve"); R. 924 (noting that surgical release "may not completely alleviate [plaintiff's] symptoms due to the fact that this has been going on for more than two years")). In addition, in medical source statements he completed in October 1997 and June 1998 and a residual functional capacity assessment he completed in November 1998, Dr. Talaie found that plaintiff's limitations in her ability to lift, carry, push, and pull were greater than those recognized by Dr. Brahms and adopted by the ALJ. (*Compare* R. 908-09, 910-16, and 1039-44, *with* R. 335-36). The ALJ appears to have discounted Dr. Talaie's November 1998 residual functional capacity assessment on the ground that although Dr. Talaie had not seen plaintiff for several months before completing the assessment, he found her to be more limited in her ability to stand and walk than he had found in May or June 1998 without supplying any clinical or laboratory basis for the change or for his conclusion that plaintiff was disabled. (R. 333-34.) However, as noted, Dr. Brahms did not review any of Dr. Talaie's assessments or underlying treatment records.

the extent of plaintiff's limitations as to (1) lifting and carrying, (2) sitting, standing, and walking, and (3) pushing and pulling (R. 335-36), and incorporating those limitations into the hypothetical he posed to the vocational expert (R. 632-33). As a result, the ALJ's conclusion that plaintiff was not disabled was not supported by substantial evidence.[13] *See Williams v. Massanari*, 171 F. Supp. 2d 829, 833-34 (N.D. Ill. 2001) (ALJ's reliance on medical expert's opinion in determining claimant's residual functional capacity was improper where expert qualified his testimony due to missing medical records from claimant's primary treating physician during the period of alleged disability).

The Commissioner argues that remand is unnecessary because "there is nothing in the evidence of record prior to 2000 that would change the [medical expert's] opinion." (Def.'s Objections 2.) But this argument is belied by the conclusions of the ALJ himself, who, after reviewing all of the relevant medical records, determined that plaintiff's limitations as a result of her carpal tunnel syndrome and surgery were greater than those identified by Dr. Brahms. (*See* R. 335 (finding "sufficient objective data" to conclude that plaintiff's "carpal tunnel syndrome or, at least, sequelae from her 1997 surgery had more than a de minim[i]s effect on functioning" and finding that plaintiff "could not perform repetitive hand motions such as typing or use hand tools" as a result of this impairment).) Moreover, in characterizing the evidence before the ALJ,

_____

[13] Had the ALJ found plaintiff to be more limited in these areas, the vocational expert may have reached a different conclusion regarding the availability of jobs that plaintiff could do in the national economy. When asked about the effect that "credit[ing] the testimony of severe pain and inability to lift even a few pounds" would have on the base of jobs that a person with plaintiff's limitations would be able to perform, the vocational expert responded that "typically to perform a full range of sedentary work we need to be able to lift 10 pounds. So, if you're only able to lift, you know, say under five pounds it would erode the sedentary work base . . . ." (R. 635.)

the Commissioner ignores the records and reports of Dr. Talaie discussed in note 12, *supra*. While the ALJ did consider these records, the purpose of consulting a medical expert was to obtain the expert's interpretation of the medical records, which did not happen here. Accordingly, remand is warranted so that the ALJ can obtain testimony from a medical expert who has reviewed the complete record, including records from 1999 and relating to the 1997 DIB claim. *See Williams*, 171 F. Supp. 2d at 835.[14]

**B.      ALJ's Failure to Consider ALJ Arrastia's Finding of Severe Mental Health Impairment**

The Commissioner also objects to the magistrate judge's conclusion that remand is required because the ALJ failed to consider ALJ Arrastia's finding that plaintiff's mental impairment was severe during the period up to and including January 23, 1999, in concluding that plaintiff had no severe mental impairment during the period beginning just one day later, on January 24, 1999.

As noted, in his January 1999 decision, ALJ Arrastia found that plaintiff's adjustment order with depression was "severe as defined under the Act, as [it] ha[d] significantly affected her ability to engage in basic work activity." (R. 671.) Although ALJ Arrastia determined that plaintiff's mental impairment did not meet or medically equal a listed impairment, he found that plaintiff was "moderately limited in her ability to understand, remember, and carry out detailed

---

[14] The court notes that on remand, the ALJ can also obtain testimony from the medical expert regarding the onset date of plaintiff's neck and back impairments.

In addition, because Dr. Brahms admitted at the hearing that he would not be commenting on plaintiff's depression, the ALJ did not have the benefit of any testimony whatsoever from a medical expert who could opine on the entire record with reference to plaintiff's asserted mental impairments. On remand, the ALJ should consider obtaining testimony from a medical expert on these issues and, if such testimony is not obtained, should explain why it is not necessary.

instructions and her ability to maintain attention and concentration" as a result of this impairment and incorporated this limitation into his analysis of plaintiff's residual functional capacity. (R. 675, 677.)

When ALJ Katzman subsequently considered plaintiff's September 2000 DIB application in August 2002, he limited his review to medical evidence not considered by ALJ Arrastia and concluded, on the basis of such evidence, that while plaintiff continued to suffer from depression up to and including December 31, 1999, her "emotional impairment, at least as of her date last insured, was not severe."[15] (R. 28-29.) When the case was thereafter remanded to the ALJ at the request of the Commissioner, the ALJ was instructed to "[c]onsider the evidence in connection with the prior application filed in July 1997 and the prior [ALJ's] decision issued on January 23, 1999," and to consider as well an October 2000 examining source opinion from Stuart Wolfe, M.D., who had diagnosed plaintiff with " a 'pain disorder associated with both psychological factors and a general medical condition'" with a duration of "'over six years.'" (R. 360-61 (quoting R. 148).)

On remand, the ALJ considered much of the evidence relating to plaintiff's July 1997 DIB application but did not mention ALJ Arrastia's decision. The ALJ again concluded, albeit on the basis of a more extensive record, that plaintiff's mental impairment was "nonsevere" during the 1999 time period at issue. (R. 332-33.) He did not address whether plaintiff

---

[15] ALJ Katzman emphasized that although plaintiff's primary care physician had diagnosed plaintiff with depression in October, November, and December 1999 and prescribed medication therefor, he did not refer plaintiff for psychiatric treatment during this period, nor did plaintiff seek such treatment on her own. (R. 27-28.) The ALJ also relied on a December 2000 report by a non-examining state agency psychologist, who found that plaintiff had no severe mental impairment. (R. 30.)

nevertheless had any limitations as a result of her depression, and as a result, he did not

incorporate any such limitations into his residual functional capacity analysis.

ALJ Arrastia's January 23, 1999, decision on plaintiff's July 1997 DIB application

became the final decision of the Commissioner when the Appeals Council denied plaintiff's

request for review.  While that decision may have been binding "upon all individuals who were

parties to [the] hearing" for the time period up to and including January 23, 1999, *see* 42 U.S.C.

§ 405(h), ALJ Katzman was not bound by the findings therein under the doctrine of *res judicata*

because the record before ALJ Katzman included new evidence that was unavailable to ALJ

Arrastia and because a later time period was involved, *see Carter v. Barnhart*, 133 F. App'x 33,

35 (3d Cir. 2005) (ALJ considering claimant's DIB claim alleging a disability as of July 1999

was not bound by prior ALJ's more restrictive findings regarding claimant's residual functional

capacity where later ALJ had benefit of new evidence that was unavailable to the prior ALJ and

where earlier application alleged a disability as of May 1995).  Nevertheless, as another district

court in this Circuit has recognized, "a prior decision as to a claimant's disability under the Act

by the Commissioner is evidence under [the applicable regulations] and must be considered by

the ALJ when evaluating a claim for benefits."  *Zavilla v. Astrue*, No. 09-133, 2009 WL

3364853, at *16 (W.D. Pa. Oct. 16, 2009); *see also* 20 C.F.R. § 404.1512(b)(5) (defining

"evidence" as "anything you or anyone else submits to us or that we obtain that relates to your

claim," including "[d]ecisions by any governmental or nongovernmental agency about whether

you are disabled or blind").  Indeed, the Appeals Council specifically directed the ALJ to

consider ALJ Arrastia's January 23, 1999, decision when it remanded the case to him in 2005.

(R. 361.)

The Commissioner argues that the ALJ's failure to consider ALJ Arrastia's finding that plaintiff's mental impairment was severe in the period just prior to her January 24, 1999, DIB application is immaterial because the ALJ considered all of the evidence that ALJ Arrastia relied on in reaching this conclusion. (Def.'s Objections 3-4.) Although the ALJ discussed much of the same evidence that ALJ Arrastia relied on, he does not appear to have considered all of the relevant reports. In particular, he made no mention of a September 1998 "Psychiatric Review Technique" on which ALJ Arrastia relied in concluding that plaintiff "had moderate difficulty in maintaining concentration and attention" as a result of her mental impairments. (*See* R. 672 (citing Exhibit 21F [R. 1025-33], in which the reviewer, J.J. Kowalsky, M.D., concluded that plaintiff was "Often" limited due to "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)"[16]).) Moreover, as noted above, ALJ Arrastia's decision is itself evidence that the Appeals Council specifically directed ALJ Katzman to consider. (R. 361.)

The court further notes that even if the ALJ's finding that plaintiff's asserted mental impairment was not severe was supported by substantial evidence, the ALJ was still required to consider any limitations plaintiff had as a result of this impairment in determining her residual functional capacity. *See Rutherford*, 399 F.3d at 554 & n.7 (ALJ must submit to the vocational expert all of claimant's credibly established impairments; however, an impairment need not be

---

[16] The reviewer rated the severity of plaintiff's impairments due to her anxiety and depression as well as her "[b]orderline-low average intelligence." (*See* R. 1028-29, 32.) Although both ALJ Arrastia and ALJ Katzman found plaintiff to have no mental impairment based on her level of intellectual functioning (*see* R. 332, 671), ALJ Arrastia, as noted, concluded that plaintiff had a severe impairment as a result of her adjustment disorder with depression (R. 671).

severe to be considered in the residual functional capacity assessment); 20 C.F.R. § 404.1545(e)

("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do

not meet or equal those of a listed impairment . . . , we will consider the limiting effects of all

your impairment(s), *even those that are not severe*, in determining your residual functional

capacity." (emphasis added)). The ALJ did not address whether plaintiff had any such

limitations and thus did not submit any such limitations to the vocational expert. (*See* R. 632-

33.) In finding that plaintiff's mental impairment was not severe, the ALJ relied on a December

2000 "Psychiatric Review Technique" in which the reviewer rated plaintiff's degree of limitation

from "Difficulties in Maintaining Concentration, Persistence, or Pace" as "Mild." (R. 160.)

However, the ALJ did not address any of the contrary findings regarding plaintiff's limitations in

this area in earlier reports.[17]

---

[17] Numerous other examining and non-examining sources found plaintiff to be more limited in her ability to concentrate. (*See* R. 825, 831 (November 1997 report of consulting psychologist noting some difficulties with respect to concentration and task persistence); R. 898 (February 1998 "Psychiatric Review Technique" rating plaintiff's degree of limitation due to "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)" as "Often"); R. 887 (February 1998 "Mental Residual Functional Capacity Assessment" finding plaintiff to have moderate limitations in the ability to carry out detailed instructions and to maintain attention and concentration for extended periods); R. 1022 (August 1998 "Psychiatric Disability Examination" report, noting, with respect to plaintiff's ability to adapt to stressful circumstances, that "she might be frozen by deadlines, conflicts to some extent beyond what would regularly be considered to be the average"); R. 1032 (September 1998 "Psychiatric Review Technique" rating plaintiff's degree of limitation due to "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)" as "Often"); R. 1034-35 (September 1998 "Mental Residual Functional Capacity assessment" finding plaintiff to be "Moderately Limited" in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting); R. 147 (October 2000 report of medical evaluation of plaintiff for her psychiatric condition noting that, during examination, plaintiff's "[c]oncentration was interfered with by testing serial sevens"). At the direction of the Appeals Council (*see* R. 360-61), the ALJ did address this last report by Dr. Stuart Wolfe, finding it "very sketchy" and rejecting as speculative Wolfe's conclusion that

Because the ALJ did not address ALJ Arrastia's findings that plaintiff's mental impairment was severe in the period immediately prior to January 24, 1999, and that, as a result of this impairment, plaintiff was "moderately limited in her ability to understand, remember, and carry out detailed instructions and her ability to maintain attention and concentration," his decision is not supported by substantial evidence. *See Zavilla*, 2009 WL 3364853, at *15-16 (ALJ's decision was not supported by substantial evidence where ALJ failed to address prior ALJ's 2002 finding that claimant was capable of only sedentary work in concluding that claimant was capable of light work by 2008). Moreover, the ALJ failed to address plaintiff's mental limitations in formulating her residual functional capacity, despite the requirement that the residual functional capacity reflect all established impairments regardless of their severity. Accordingly, the case will be remanded so that the ALJ (1) can consider ALJ Arrastia's findings regarding the severity of plaintiff's mental impairment and limitations as a result of that impairment and (2) can consider any limitations plaintiff may have as a result of her mental impairment in determining plaintiff's residual functional capacity.[18]

---

plaintiff "had been disabled by pain and/or depression for the past six years" (R. 332-33). However, the ALJ did not address Dr. Wolfe's observation regarding plaintiff's concentration.

These kinds of limitations could have affected the vocational expert's testimony as, when asked to credit the plaintiff's testimony regarding her severe pain, the vocational expert noted that "there was some testimony about difficulty concentrating, staying on tasks" and observed that "if someone were unable to stay on task because of pain . . . , I think it would preclude competitive work." (R. 635-36.) *See Ramirez v. Barnhart*, 372 F.3d 546, 552-56 (3d Cir. 2004) (remanding case where ALJ failed to adequately convey claimant's deficiencies in concentration, persistence, and pace in hypothetical posed to vocational expert).

[18] The court, of course, is not considering whether plaintiff was in fact disabled as of her date last insured or whether she remains disabled, and expresses no opinion on these issues.

## C.     ALJ's Credibility Assessments

Finally, the Commissioner objects to the magistrate judge's conclusion that the ALJ committed legal error by failing to address the credibility of plaintiff's husband and mother and the impact of their testimony on plaintiff's own credibility.

As with medical reports, the ALJ must "consider and weigh all of the non-medical evidence before him," including the testimony of lay witnesses present to bolster the claimant's own credibility. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000); *see also Van Horn v. Schweiker*, 717 F.2d 871, 873-74 (3d Cir. 1983). In *Van Horn*, the Third Circuit found reversible error where the ALJ disregarded the testimony of the claimant's mother and his Alcoholics Anonymous sponsor without making a finding as to those witnesses' credibility. *Id.* at 873-74. Similarly, in *Burnett*, the Third Circuit found reversible error where the ALJ failed to address the testimony of the claimant's husband and her neighbor. 220 F.3d at 122. The Commissioner argued in *Burnett* that it was unnecessary for the ALJ to mention this testimony because "it 'added nothing more than stating [claimant's] testimony was truthful,'" but the court rejected the argument, observing that the ALJ had made a credibility determination regarding the claimant, whose credibility the witnesses "were there to bolster." *Id.* (citation omitted).

Unlike in *Burnett*, where the ALJ failed to mention the testimony of the claimant's husband and neighbor, the ALJ in this case did address the testimony of plaintiff's husband and her mother to some extent, observing that plaintiff's "spouse and mother verify some of her contentions" (R. 335) and noting several instances in which plaintiff's husband and mother

corroborated plaintiff's testimony (*see* R. 331-34).[19]  Although the ALJ did not make any specific

findings regarding the credibility of these witnesses, he implied that their testimony was not

entirely credible in certain respects.  For example, in recounting that both plaintiff and her

mother testified at the November 2006 hearing that plaintiff had dropped her baby on one

occasion, the ALJ noted that claimant and her husband had not mentioned this incident during

their 2002 testimony.  (R. 334.)  Likewise, the ALJ observed that while plaintiff and her husband

both testified in 2006 that she had had neck symptoms in 1999, they "had little to say in 2002

about neck pain."  (R. 333.)

Because I conclude that remand is warranted for other reasons, I need not decide whether

the ALJ's failure to address more directly the credibility of plaintiff's mother and husband and

the impact of their testimony on plaintiff's own credibility itself amounts to reversible error.

*Compare, e.g.*, *Kuhn v. Barnhart*, No. 02-6873, 2004 WL 414069, at \*13 (E.D. Pa. Mar. 3, 2004)

(finding ALJ's failure to address sufficiently the credibility of claimant's husband to be

reversible error), *with Terrey v. Astrue*, No. 06-1959, 2007 WL 1237936, at \*4 (E.D. Apr. 25,

2007) (finding ALJ's failure to discuss claimant's wife's credibility and failure to mention the

testimony of another witness to be harmless error where it was obvious that, to the extent that the

ALJ discounted the credibility of these witnesses, she did so for the same reasons she discounted

the claimant's own testimony, and where this error would not have changed the outcome of the

---

[19] In particular, the ALJ acknowledged plaintiff's mother's testimony that plaintiff's condition had gotten progressively worse since her 1997 hand surgery (R. 331) and that she had dropped her baby on one occasion (R. 334).  The ALJ also noted that plaintiff's husband had testified regarding plaintiff's "neck symptoms in 1999" (R. 333) and regarding the extent of plaintiff's limitations with respect to various household tasks (R. 334).  The ALJ further observed that both plaintiff's mother and her husband had testified that plaintiff "had been depressed and anxious in 1999."  (R. 332.)

case).  On remand, however, the ALJ should address the credibility of these witnesses as well as the impact of their testimony on plaintiff's own credibility.[20]

## IV.    Conclusion

As set forth above, because the ALJ improperly relied on the testimony of a medical expert who did not review all of the relevant medical records and failed to consider the prior ALJ's findings regarding the severity of and limitations resulting from plaintiff's mental impairment, his decision is not supported by substantial evidence.  Accordingly, the court will adopt the recommendation of the magistrate judge and remand the case to the ALJ for further consideration consistent with this memorandum.  An appropriate order follows.

---

[20] In her brief in support of her request for review, plaintiff also argued that the ALJ's finding regarding plaintiff's own credibility was improper because the ALJ gave more weight to the medical evidence or the lack thereof based on a flawed view of the medical evidence, influenced in part by his improper reliance on the medical expert's testimony.  (Pl.'s Br. in Supp. of Req. for Review 27-28.)  Because the court has directed the ALJ to obtain testimony from a medical expert who has reviewed all of the relevant medical records and to consider ALJ Arrastia's findings regarding the severity of and limitations resulting from plaintiff's mental impairment, the ALJ will have to reassess plaintiff's credibility in light of any new evidence on these issues.